# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | | |
|---|---|---|
| GEORGIA-PACIFIC CONSUMER OPERATIONS, LLC, <br>     Plaintiff/Counter Defendant, <br><br> v. <br><br> UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS UNION, LOCAL 9-0952, <br>     Defendant/Counter Claimant, <br><br> and <br><br> ROGER IRVIN, <br>     Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | CIVIL ACTION NO. 1:19-00112-CG-N |

## REPORT AND RECOMMENDATION

Plaintiff Georgia-Pacific Consumer Operations, LLC ("Georgia-Pacific") initiated this civil action by filing a complaint seeking to vacate a labor arbitration decision largely in favor of Defendant Roger Irvin, a member of Defendant United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers Union, Local 9-0952 ("the Union"). (*See* Doc. 1). The Defendants served answers to the complaint, with the Union also asserting a counterclaim against Georgia-Pacific to enforce the subject arbitration decision. (*See* Docs. 14, 17). The Court held a telephonic scheduling conference on the record with counsel for the parties on July 19, 2019, where it was agreed that the parties' claims would be decided on briefs and, if necessary, oral argument.[1] Accordingly, the Court set a

---

[1] As noted in the scheduling order, "[s]ince this is a judicial review of an arbitration

briefing schedule, later amended, on the issue of whether to vacate the arbitration decision. (*See* Docs. 21, 24). Pursuant to that briefing schedule, the following documents were timely filed:

- Records from the subject arbitration proceedings (Doc. 23), some of which were already included as exhibits to the complaint (Doc. 1)
- Georgia-Pacific's brief stating the specific reasons it claims the subject arbitration decision should be vacated (Doc. 25)[2]
- The Defendants' response in opposition to Georgia-Pacific's brief (Doc. 28), which also requests that Irvin be dismissed as a party to this action
- Georgia-Pacific's reply to the Defendants' response (Doc. 29)

Briefing on this matter is now closed (*see* Doc. 24), and the assigned District Judge has referred the aforementioned briefing to the undersigned Magistrate Judge for appropriate action under 28 U.S.C. § 636(a)-(b), Federal Rule of Civil Procedure 72, and S.D. Ala. GenLR 72(a). *See* S.D. Ala. GenLR 72(b); (10/16/2019, 11/4/2019, & 11/15/2019 electronic references). Upon consideration, the undersigned finds oral argument to be unnecessary[3] and will, pursuant to § 636(b)(1)(B)-(C), Rule 72(b)(1), and GenLR 72(a)(2)(S), recommend that the Court

---

award, no discovery is needed or allowed." (Doc. 21, PageID.376).

[2] This action was transferred to the docket of the undersigned Magistrate Judge from that of the originally assigned Magistrate Judge on October 15, 2019, after the filing of Georgia-Pacific's initial brief. (*See* Doc. 26).

[3] While Georgia-Pacific has requested oral argument in its briefing, it fails to offer "specific reasons why oral argument would be helpful[,]" S.D. Ala. CivLR 7(h), and the undersigned finds that this matter can be sufficiently resolved on consideration of the parties' briefs and the current record. *See* Fed. R. Civ. P. 78(b); S.D. Ala. CivLR 7(h).

**DENY** Irvin's request to be dismissed as a party, and **VACATE** the subject arbitration for the reasons explained, and to the extent noted, herein.

## I. *Background*

Georgia-Pacific operates a pulp and paper mill in Naheola, Alabama. The Union represents that facility's production and maintenance employees, including Irvin, a machinist. Georgia-Pacific and the Union entered into a collective bargaining agreement ("the Contract") that provides for arbitration of disputes that involve the interpretation or application of its terms. (Doc. 1-5, PageID.299-300).[4]

On January 9, 2018, Irvin, then a nine-year employee at the Naheola mill, tested positive for opiates after being subject to a random drug screening. As a result, Georgia-Pacific terminated Irvin for violating its "zero tolerance" Drug and Alcohol Policy. The Union submitted a grievance that Georgia-Pacific lacked just cause to terminate Irvin (Grievance No. 952/18-01 (Roger "Mickey" Irvin)). Said grievance was processed in accordance with the procedures set forth in of Article 23 of the Contract. After negotiations failed to produce an acceptable resolution, the Union appealed the grievance to arbitration, and the parties selected as arbitrator James J. Odom, Jr. (hereinafter, "the Arbitrator"). The Arbitrator held a hearing on October 23, 2018, and declared the hearing closed as of December 3, 2018, following the timely submission of post-hearing briefs. (Doc. 1-5, PageID.299-300).

On January 4, 2019, the Arbitrator issued a decision sustaining the grievance "to the extent that the termination of Roger Irvin is extinguished for the reason that

---

[4] The agreement to submit grievances to arbitration if prior negotiations fail is found in Article 23 of the Contract, at Section 1.D.Step 4, and Section 2. (Doc. 1-5 at 43 – 46). The Contract specifies that any issue submitted to arbitration "must be one arising out of an alleged violation of this Agreement or a claim that the Company has taken disciplinary action without just cause." (*Id.* at 44).

just cause for termination did not exist." The Arbitrator further ordered that Irvin be reinstated to his employment with Georgia-Pacific as soon as practicable and be made whole for all time lost due to the termination, except for a 90-day disciplinary suspension. (*Id.*, PageID.576).[5] On March 11, 2019, Georgia-Pacific commenced this action to vacate the Arbitrator's decision under Section 301 of the Labor Management Relations Act of 1947, 29 U.S.C. § 185.[6] (*See* Doc. 1).

## II. *Analysis*

### A. Irvin is a Proper Party to this Action

As an initial matter, Irvin has argued, "[i]ndependent of whether the Court should enforce or vacate" the Arbitrator's decision, that he should be dismissed

---

[5] This factual background is composed of findings in the Arbitrator's decision (Doc. 1-5) that the parties do not dispute here. *See Warrior & Gulf Nav. Co. v. United Steelworkers of Am., AFL-CIO-CLC*, 996 F.2d 279, 280 (11th Cir. 1993) (per curiam) ("A court generally must defer to an arbitrator's findings of fact.").

[6]
> The Supreme Court has recognized that the Labor Management Relations Act of 1947 (LMRA) provides an independent basis for federal jurisdiction over labor arbitration awards arising out of collective bargaining agreements, and that the LMRA empowers federal courts to fashion a body of federal common law standards for confirming and vacating labor arbitration awards. *Textile Workers Union v. Lincoln Mills of Ala.*, 353 U.S. 448, 450–52, 77 S. Ct. 912, 914–15, 1 L. Ed. 2d 972 (1957); *see also United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union AFL–CIO CLC v. Wise Alloys, LLC*, 642 F.3d 1344, 1352 (11th Cir. 2011) (explaining that the LMRA "governs suits to enforce or vacate an arbitration award arising out of a collective bargaining agreement").

*Wiregrass Metal Trades Council AFL-CIO v. Shaw Envtl. & Infrastructure, Inc.*, 837 F.3d 1083, 1087 n.1 (11th Cir. 2016). Accordingly, the Court has subject matter jurisdiction over the causes of action asserted in this case, and federal common law, rather than state law, governs their resolution. No party has argued otherwise.

because he is not a proper party to this action. In support, he notes that Section 301 of the LMRA creates a cause of action "for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce … , or between any such labor organizations," 29 U.S.C. § 185(a), and that "Irvin is neither a labor organization nor an employer under the meaning of Section 301." (Doc. 28, PageID.616). Georgia-Pacific does not address this argument in its reply brief.

Nevertheless, the undersigned finds that Irvin is a proper party to this action. While his argument is plausible as a purely textual matter, the United States Supreme Court has held that "Section 301 contemplates suits by and against individual employees as well as between unions and employers; and contrary to earlier indications s 301 suits encompass those seeking to vindicate uniquely personal rights of employees such as wages, hours, overtime pay, and wrongful discharge." *Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554, 562 (1976) (quotation marks omitted). Accordingly, the undersigned will recommend that the Court **DENY** Irvin's request to be dismissed as an improper party.

### B. The Arbitrator Exceeded His Authority under the Contract

The Defendants observe that Georgia-Pacific is "attempt[ing] one of the most difficult feats in American jurisprudence – the vacation of a labor arbitration award." (Doc. 28, PageID.600). As a general matter, the Eleventh Circuit Court of Appeals would agree, having noted "the law's insistence that arbitration losers who resort to the courts continue to lose in all but the most unusual circumstances…" *Wiregrass Metal Trades Council AFL-CIO v. Shaw Envtl. & Infrastructure, Inc.*, 837 F.3d 1083, 1086 (11th Cir. 2016). Nevertheless, after

careful consideration of Eleventh Circuit precedent, the undersigned concludes that Georgia-Pacific has accomplished this difficult feat and shown that this is one of the unusual circumstances justifying vacatur.

The undersigned, of course, recognizes that

> a court's review of an arbitrator's decision is limited. See United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union AFL–CIO–CLC v. Wise Alloys, LLC, 807 F.3d 1258, 1271 (11th Cir. 2015). While a federal court may vacate an arbitration award when it "exceeds the scope of the arbitrator's authority," IMC–Agrico Co. v. Int'l Chem. Workers Council of the United Food & Commercial Workers Union, AFL–CIO, 171 F.3d 1322, 1325 (11th Cir. 1999), few awards are vacated because the scope of the arbitrator's authority is so broad, see Bakery, Confectionery & Tobacco Workers Local Union No. 362–T, AFL–CIO–CLC v. Brown & Williamson Corp., 971 F.2d 652, 655 (11th Cir. 1992). In determining whether an arbitrator has exceeded her broad authority, two principles guide us.
>
> The first is that we must defer entirely to the arbitrator's interpretation of the underlying contract no matter how wrong we think that interpretation is. As the Supreme Court has explained: "Because the parties bargained for the arbitrator's construction of their agreement, an arbitral decision even arguably construing or applying the contract must stand, regardless of a court's view of its (de)merits." Oxford Health Plans LLC v. Sutter, 569 U.S. ——, 133 S. Ct. 2064, 2068, 186 L. Ed. 2d 113 (2013) (quotation marks omitted); see also United Paperworkers Int'l Union, AFL–CIO v. Misco, Inc., 484 U.S. 29, 38, 108 S. Ct. 364, 371, 98 L. Ed. 2d 286 (1987). That means "the sole question for us is whether the arbitrator (even arguably) interpreted the parties' contract, not whether [s]he got its meaning right or wrong." Sutter, 133 S. Ct. at 2068. If we determine that "the arbitrator (even arguably) interpreted the parties' contract," we "must end [our] inquiry and deny ... a motion for vacatur." S. Commc'ns Servs., Inc. v. Thomas, 720 F.3d 1352, 1359 (11th Cir. 2013).
>
> The second principle guiding our decision is that "an arbitrator 'may not ignore the plain language of the contract.' " Warrior & Gulf Nav.

Co. v. United Steelworkers of Am., AFL–CIO–CLC, 996 F.2d 279, 281 (11th Cir. 1993) (quoting Misco, 484 U.S. at 38, 108 S. Ct. at 371). That means an arbitrator may not "issue[ ] an award that contradicts the express language of the agreement." IMC–Agrico Co., 171 F.3d at 1325; see also Bruno's, Inc., 858 F.2d at 1531. It also means that an arbitrator may not modify clear and unambiguous contract terms. See Houston Lighting & Power Co. v. Int'l Bhd. of Elec. Workers, Local Union No. 66, 71 F.3d 179, 184 (5th Cir. 1995) ("If the language of the agreement is clear and unequivocal, an arbitrator is not free to change its meaning."); Sears, Roebuck & Co. v. Teamsters Local Union No. 243, 683 F.2d 154, 155 (6th Cir. 1982) ("[A]n arbitrator may construe ambiguous contract language, but lacks authority to disregard or modify plain or unambiguous contract provisions.").

Those two principles define the scope of the arbitrator's authority. The arbitrator acts within her authority when she even arguably interprets a contract, and she exceeds her authority when she modifies the contract's clear and unambiguous terms.

*Id.* at 1087–88.[7]

The Arbitrator based his decision on the interplay of provisions in Articles 8 and 24 of the Contract. Article 8, entitled "Rights of Management," provides as follows:

> Section 1. Unless specifically abridged by the terms of this Agreement, the Company [Georgia-Pacific] shall be vested with all of the rights that it would have in the absence of this Agreement, including those enumerated below, but not to the exclusion of other rights which are not specifically enumerated but which normally belong to and are inherent to management.

---

[7] A district court can also vacate an arbitration award if it is "irrational," *IMC-Agrico Co. v. International Chemical Workers Council of United Food & Commercial Workers Union, AFL-CIO*, 171 F.3d 1322, 1325 (11th Cir. 1999), or violates public policy. *See Delta Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l*, 861 F.2d 665, 669-71 (11th Cir. 1988).

Section 2. Except as expressly limited by this Agreement, the management of the business, including the scheduling and assignment of work, the manning of the mill and direction of the working force, the right to establish, change or introduce new or improved methods, or quality and production standards, is the exclusive prerogative and responsibility of the Company. The Company is vested also with the right to promote, suspend, demote, transfer or relieve employees from duty because of lack of work or other just cause, *discipline and discharge employees for just cause* and establish and enforce reasonable safety and work rules.

The Company in exercising its rights under this Article will adhere to the provisions of this Agreement.

(Doc. 1-2 at 7 – 8 (emphasis added)).

Section 3 of Article 24, entitled "Drug & Alcohol Policy," provides, in relevant part, as follows:

The Company is committed to providing a safe workplace for all employees. It is in the interest of the employees, the Company, the Union and the community that the Naheola facility remains free from employees reporting for work or working under the influence of illegal drugs, controlled substances or alcohol. Acknowledging the need for action, the following alcohol and drug testing program will apply: …

The Company will establish a "zero tolerance" random drug testing program for all Company employees at the Naheola facility. Random testing will not include testing for alcohol.

Elements of the plan will include:

1. An employee assistance plan, available to employees who seek assistance prior to being notified of their selection for testing.

2. A Medical Review officer review of all positive results.

3. Random testing procedure.

4. Continued use of "for cause" and post accident testing.

5. *Discharge for a positive test result.* Failure to take a test as reasonably designated by Management would be considered a positive test result.

(Doc. 1-2 at 46 – 47 (emphasis added)).[8]

Georgia-Pacific's promulgated "zero tolerance" random drug testing program is set forth in Section II(2) of its "Corporate Drug and Alcohol Testing Program – Non-DOT Policy" ("the GP Drug Policy"), and provides that "[a]ll employees who test positive for any substances listed in Section I (Introduction) will be immediately terminated, unless otherwise prohibited by a collective bargaining agreement or applicable law." (Doc. 23-1, PageID.490). Section I specifically lists "opiates" as one of the substances for which "[a]ny drug test required under this policy will test for the presence…" (Doc. 23-1, PageID.488).[9]

The Arbitrator framed the parties' dispute as follows: "Does the Contract require [Georgia-Pacific] to demonstrate just cause in order to terminate an employee who has tested positive for opiates during a random drug screen?" (Doc. 1-5, PageID.309). The Arbitrator noted that Georgia-Pacific's position was an

---

[8] Portions of Article 22 were also included in the "relevant contractual provisions" section of the Arbitrator's decision. (*See* Doc. 1-5, PageID.307-308). Article 22, Section II provides, *inter alia*, that "[r]eporting for duty under the influence of drugs or alcohol" "shall constitute a violation of Company rules and shall be cause for disciplinary action up to and including discharge." (Doc. 1-2 at 41). However, unlike Articles 8 and 24, the Arbitrator did not mention Article 22 in his substantive analysis. (*See* Doc. 1-5, PageID.309-312).

[9] The Arbitrator found "that the GP Drug policy, with its zero tolerance standard, had long been in place and accepted by the workforce in general, and [Irvin], specifically," and rejected as "not convincing" the Union's contention that the GP Drug Policy was not applicable to Irvin. (Doc. 1-5, PageID.310). The Defendants do not contest those findings.

emphatic " 'No,' [Irvin]'s positive test *is* the required evidence of just cause. (*Id.*, PageID.310). Regarding Article 24, Section 3, and the GP Drug Policy's "zero tolerance" provision, the Arbitrator stated: "Obviously, maintaining a safe, drug-free work place is a necessary and positive goal of the Company. And I understand the theory that a well-advertised, strictly interpreted zero tolerance policy requiring every employee who tests positive on a random drug screen be immediately discharged could have a greater tendency to reduce the presence of drugs in a workplace than a practice that is less forceful." (*Id.*, PageID.310). Nevertheless, interpreting Article 8, Section 2 as "limit[ing] Management's right to discipline and discharge employees to just cause[,]" (*id.*), the Arbitrator rejected Georgia-Pacific's position, instead appearing to accept the Union's argument that Georgia-Pacific "must synchronize the just cause standard in the C[ontract] with the Zero Tolerance of the drug policy." (*Id.*, PageID.305). As to whether there was "just cause" to terminate Irvin, the Arbitrator found:

> As a labor arbitrator, I am unable to interpret as reasonable or just any decision to terminate that purposefully ignores the circumstances and causes surrounding the violation. That the grievant lacked all intent to take codeine into his system, that it was by accident that he drank cough syrup containing codeine, that even after he had drunk cough syrup from his wife's bottle and reported to work the next day, he remained unaware that by accident, he had taken a prescription drug, are all factors that are at least potentially relevant to the determination of a penalty that is proportional to the offense – one useful measure in determining just cause.
>
> The factor that concerns me most with the Company's interpretation of zero tolerance is the mandatory omission of any attempt by the Company to assess the amount of fault attributed to Mr. Irvin in

causing the violation and to balance it with the degree of severity of the penalty reasonably due him because of that fault.

According to Mr. Irvin's unchallenged testimony, he woke up coughing badly and drank cough medicine from a bottle in the medicine cabinet in the bathroom. The next day he went to work, was told of a call for a random drug test and took the test after agreeing with another employee to an arrangement whereby he and the other employee substituted for the plant guard as a witness for each other's test. They did so in order to prevent their tests being postponed to another day. Irvin then went to his doctor for his cough. It was several days later that he learned he had failed the drug test and surmised that he had taken cough syrup that contained codeine from a prescription similar to his over the counter bottle that contained no drugs.

Had Irvin knowingly drunk from his wife's bottle, common sense assures that he surely would have accepted the opportunity to postpone the test. Did Irvin also report to work and work a shift under the influence of drugs, knowingly or unknowingly? No one testified that Irvin demonstrated any signs of being under the influence on January 9, 2018, the day he took the drug screen. According to the affidavit of Dr. Simo, because Irvin tested positive, he "*may* have been under the influence of Opiates at the time his sample was taken at Georgia Pacific."

In no way do the actions of this employee of nine years with a spotless disciplinary and work record constitute just cause to be terminated. Still, as the Company contends, Mr. Irvin made the error of mistake by mistaking his wife's bottle of prescription medicine for his own non-prescription bottle of medicine. The Company argues that mistakes have negative consequences and that the grievant is responsible for the negative results from his mistakes. This arbitrator agrees. Yes, Mr. Irvin did violate Georgia Pacific's Drug Policy, whether knowingly or not. And he is due to bear some amount of negative consequences, but not discharge. Just cause for termination did not exist.

(*Id.*, PageID.310-312).

Georgia-Pacific argues that *Warrior & Gulf Navigation Co. v. United Steelworkers of America, AFL-CIO-CLC*, 996 F.2d 279 (11th Cir. 1993) (per curiam), "is directly on point on the issues here" and mandates a finding that the Arbitrator impermissibly modified the terms of the Contract. (Doc. 25, PageID.589). In *Warrior & Gulf*, the collective bargaining agreement at issue gave the employer Warrior the authority to drug test its employees, and provided that an employee who tested positive a second time was "subject to immediate discharge." 996 F.2d at 279-80. However, another provision of the agreement "suggest[ed] that Warrior must have 'just cause' to fire an employee." *Id.* at 280.[10] After Warrior terminated employee Files for a second positive drug test, Files challenged the decision in arbitration in accordance with the collective bargaining agreement. *Id.* at 280. An arbitrator reduced the penalty from discharge to disciplinary suspension, finding that, while "Files had been aware of these contractual requirements and that his April 17 test was legitimate, positive for marijuana, and did not violate the Agreement[,] the Agreement's 'just cause' provision required Warrior to use 'just and equitable' procedures in its decision to fire an employee." *Id.*

Warrior challenged the arbitrator's decision in federal district court, which vacated the decision after finding "that that the arbitrator had no discretion to find

---

[10] Similar to Article 8, Section 2 of the Contract, the "just cause" provision in the *Warrior & Gulf* agreement provided, in relevant part: "The Management of the Company and the direction of the working force, including the right to hire, suspend or discharge for proper cause, or transfer, and the right to relieve employees from duty because of lack of work, or for other legitimate reasons, is vested exclusively in the Company…" 996 F.2d at 280 n.5.

that Warrior lacked 'just cause' in discharging Files, when the express terms of the contract granted Warrior such authority under the facts determined by the arbitrator." *Id.* On appeal, a panel of the Eleventh Circuit affirmed, holding:

> The Agreement says that an employee who tests positive a second time is "subject to immediate discharge." This express language gives management the complete discretion to fire an employee. Once [the arbitrator] had found that, as a matter of fact, Files tested positive for drugs for the second time on April 17, these express terms required [the arbitrator] to uphold management's decision.
>
> We stop short of the question of how much discretion arbitrators have in interpreting the "just cause" provision of a contract in cases where their interpretations do not conflict with a specific and express contractual provision. Because the Agreement expressly addresses the particular contingency of a second positive drug test, we conclude that the Agreement's "just cause" standard is consistent with this explicit provision.
>
> The Agreement allowed Warrior to conduct the April 17 and 29 tests when it did, and to discharge Files for the positive result from the April 17 test. Under these circumstances, we conclude as a matter of law that Warrior, pursuant to the terms of the pertinent agreement, had "just cause" to fire Files.

*Id.* at 281 (footnotes omitted).

The Defendants counter that the facts of this case are more like those in *IMC-Agrico Co. v. International Chemical Workers Council of United Food & Commercial Workers Union, AFL-CIO*, 171 F.3d 1322 (11th Cir. 1999). Similar to those in the present case and *Warrior & Gulf*, the collective bargaining agreement at issue in that case specified that the employer IMC-Agrico "retains the right to hire, discharge, discipline for just cause…" *IMC-Agrico*, 171 F.3d at 1325. The agreement also included a provision vesting IMC-Agrico with "the establishment

and enforcement of reasonable rules of conduct..." *Id.* Pursuant to the latter provision, IMG-Agrico promulgated Rules and Regulations creating a hierarchy of infractions, with "major infractions" entailing "a '2 or 1–Step Disciplinary Process' of 'Disciplinary Layoff (or) ... Discharge.'" *Id.*

IMC-Agrico terminated employee Whitely for offenses listed as specific examples of "major infractions" in the Rules and Regulations. *See id.* at 1324-26. On Whitely's challenge to that decision, an arbitrator agreed that Whitely had committed "major infractions," but ordered her reinstated without back pay, finding that a lesser penalty of "disciplinary layoff" was warranted based on mitigating circumstances. *Id.* at 1324. IMC-Agrico petitioned the district court to vacate the arbitrator's decision, arguing "that once the arbitrator had determined that Whitely's offense was grave enough to amount to a major infraction under the company's rules and warrant either discharge or disciplinary layoff, it was beyond the arbitrator's authority to tell the company that it exercised its discretion wrongly in choosing between those two options." *Id.* at 1324–25. The district court agreed and vacated the arbitrator's decision, but the Eleventh Circuit reversed.

On appeal, IMG-Agrico argued "that under the collective bargaining agreement, the just-cause provision only applies to its decision to discipline an employee and does not extend to the choice of possible sanctions contained in its Rules and Regulations." *Id.* at 1326. Citing *Warrior & Gulf*, and similar cases from other circuits, as standing for the "unobjectionable principle that an employer can bargain to have included in a collective bargaining agreement a provision to the

effect that certain identified types of employee conduct always provide just cause for discharge[,]" the *IMG-Agrico* panel distinguished those cases from the one at hand, holding:

> In this case, the collective bargaining agreement does not clearly indicate whether the just-cause provision applies to the company's choice of a particular sanction for an employee's misconduct. Furthermore, the agreement does not contain any definition of just cause or any list of offenses that would always support the company's decision to discharge an employee. Instead, IMC–Agrico promulgated its own rules regarding the types of discipline that could be imposed for specified conduct. Although these rules were promulgated pursuant to authority given the company in the collective bargaining agreement, there is no language in the agreement mandating the construction of the agreement urged by IMC–Agrico.
>
> The arbitrator, in interpreting the collective bargaining agreement's just-cause provision, implicitly concluded that it allowed him to review not only whether the challenged conduct had occurred, but also whether the sanction chosen by IMC–Agrico—discharge—was "just." Under this interpretation of the agreement, he concluded that even though Whitely had engaged in a major infraction as defined by IMC–Agrico's rules, that did not automatically mean that discharge was a "just" sanction. Instead, he construed the agreement to allow him to review the appropriate sanction for rule violations considering, among other things, the seriousness of the offense and the employee's work record. In essence, the arbitrator read the language of the agreement to allow him to conclude that conduct and circumstances that would constitute just cause for one particular sanction did not always provide just cause for imposition of another sanction. We hold that the arbitrator adopted a reasonable interpretation of the just-cause provision of the agreement. When there are two plausible interpretations of an agreement, then the arbitrator's choice of one over the other will be honored.

*Id*. at 1327–28. The panel further noted that its conclusion was "supported by authority in other circuits [holding] that if a collective bargaining agreement does

not define 'just cause' *and* does not include a list of offenses that would lead to termination, then any reviewing court must defer to an arbitrator's interpretation of the scope and meaning of the just-cause provisions of the agreement." *Id*. at 1328 (emphasis added).

Georgia-Pacific asserts that the GP Drug Policy's "zero tolerance" random drug testing program, like the provision in *Warrior & Gulf* providing for "immediate termination" for a second positive drug test, is an express part of the collective bargaining agreement at issue. (*See* Doc. 25, PageID.580, 587). On the other hand, the Defendants argue the GP Drug Policy is more akin to the Rules and Regulations in *IMG-Agrico* – promulgated pursuant to the terms of a collective bargaining agreement, but not actually a part of it. It is true that the GP Drug Policy is a separate document, and there does not appear to be language in the Contract expressly incorporating its terms. Indeed, the GP Drug Policy specifies that immediate termination for a positive random drug test is not mandatory if it is "otherwise prohibited by a collective bargaining agreement…" (Doc. 23-1, PageID.490). While the Arbitrator's decision referenced the GP Drug Policy's "zero tolerance standard," (*see* Doc. 1-5, PageID.310), the Arbitrator did not list any part of the Drug Policy in the section of his decision headed "relevant contractual provisions." (*See id.*, PageID.307-309). As for Article 24, Section 3, the Arbitrator characterized that provision of the Contract as a "commitment" to establish a "zero tolerance" random testing program, with the Drug Policy being Georgia-Pacific's "response" to that commitment. (Doc. 1-5, PageID.310).

Nevertheless, even if the Contract does not expressly incorporate *in toto* the GP Drug Policy and/or its "zero tolerance" random drug testing program, Article 24, Section 3 specifies certain terms of Georgia-Pacific's alcohol and drug testing program that "will apply" – in relevant part, that Georgia-Pacific "will establish a 'zero tolerance' random drug testing program for all Company employees at the Naheola facility[,]" and that "[d]ischarge for a positive test result" will be an "element" of that plan. (Doc. 1-2 at 46 – 47). Thus, unlike the *IMG-Agrico* agreement, which did "not contain any definition of just cause *or* any list of offenses that would always support the company's decision to discharge an employee," 171 F.3d 1327 (emphasis added), Article 24, Section 3 of the Contract "expressly addresse[d] the particular contingency of a … positive drug test" under the "zero tolerance" random drug testing program that the Contract permitted Georgia-Pacific to establish, *Warrior & Gulf*, 996 F.2d at 281, specifying that it was an "offense[] that would lead to termination…" *IMG-Agrico*, 171 F.3d at 1328. Article 8, Section 2 vests Georgia-Pacific "with the right to … discipline and discharge employees for just cause[,]" (Doc. 1-2 at 8), and this " 'just cause' standard is consistent with th[e] explicit provision" for discharge in Article 24, Section 3. *Warrior & Gulf*, 996 F.2d at 281.[11]

---

[11] The Defendants argue "[i]t is a more than plausible reading of Article 24, Section 3, that the random drug testing program agreed to therein permits penalties other than discharge for a positive test result, and permits the application of Article 8's 'just cause' requirement to disciplines issued under the program." (Doc. 28, PageID.609). However, a similar argument was rejected in *Warrior & Gulf*. There, the panel, while appearing to accept the union's claim that "the 'subject to immediate discharge' language did not *require* management to fire Files[,]"

The Arbitrator expressly found, and no party disputes here, that Irvin "did violate Georgia Pacific's Drug Policy" by returning a positive result under the random drug testing program, and even agreed with Georgia-Pacific that, as a result, Irvin was "due to bear some amount of negative consequences," though not discharge. (Doc. 1-5, PageID.312). However, having found that Irvin "engaged in conduct that is defined by [the Contract] to be an offense subjecting him to discharge, then that [wa]s an implicit finding of just cause and the [A]rbitrator's task [wa]s finished." *IMC-Agrico*, 171 F.3d at 1327. Accordingly, the Arbitrator exceeded his authority by substituting his own notion of what was "reasonable or just" in overturning Irvin's termination, and his decision is therefore due to be vacated to the extent he determined that "just cause" did not exist to justify Irvin's termination and ordered reinstatement with back pay and a 90-day disciplinary suspension.[12]

---

nevertheless held: "For present purposes, … it is enough that management had the complete *discretion* to fire Files. Because management had, given the facts, complete discretion to fire Files, [the arbitrator] had no discretion to interfere." *Warrior & Gulf*, 996 F.2d at 281 n.7.

    The Defendants' argument that the Arbitrator's decision should be affirmed because he was permitted to consider "the practices of the industry and the shop" in interpreting the Contract are similarly unavailing, in light of the Contract's express provision permitting Georgia-Pacific to discharge an employee for a positive drug test. *See id.* n.8 (In *Sullivan Long & Hagerty, Inc. v. Local 559*, 980 F.2d 1424 (11th Cir. 1993), "[w]e allowed arbitrators to apply background labor law principles, but also reaffirmed the principle that arbitrators must follow the express terms of collective bargaining agreements." (citing 980 F.2d at 1431)).

[12] In light of this determination, the undersigned need not address Georgia-Pacific's alternative arguments that the Arbitrator's decision should be vacated as irrational and as violating public policy.

### III. *Conclusion*

In accordance with the foregoing analysis, and pursuant to 28 U.S.C. § 636(b)(1), Federal Rule of Civil Procedure 72(b)(1), and S.D. Ala. GenLR 72(a)(2)(S), the undersigned **RECOMMENDS** as follows:

1. that Irvin's request to be dismissed from this action as an improper party be **DENIED**;

2. that the Arbitrator's January 4, 2019 decision on the Union's Grievance No. 952/18-01 be **VACATED** to the extent the Arbitrator determined that "just cause" did not exist to justify Irvin's January 9, 2018 termination and ordered reinstatement with back pay and a 90-day disciplinary suspension; and

3. that final judgment be issued on Georgia-Pacific's claim and the Union's counterclaim in accordance with the foregoing and Federal Rule of Civil Procedure 58.

**DONE** this the 13th day of December 2019.

>  */s/ Katherine P. Nelson*
>  **KATHERINE P. NELSON**
>  **UNITED STATES MAGISTRATE JUDGE**

## NOTICE OF RIGHT TO FILE OBJECTIONS

A copy of this report and recommendation shall be served on all parties in the manner provided by law. Any party who objects to this recommendation or anything in it must, within fourteen (14) days of the date of service of this document, file specific written objections with the Clerk of this Court. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); S.D. Ala. GenLR 72(c). The parties should note that under Eleventh Circuit Rule 3-1, "[a] party failing to object to a magistrate judge's findings or recommendations contained in a report and recommendation in accordance with the provisions of 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions if the party was informed of the time period for objecting and the consequences on appeal for failing to object. In the absence of a proper objection, however, the court may review on appeal for plain error if necessary in the interests of justice." 11th Cir. R. 3-1. In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the Magistrate Judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the Magistrate Judge is not specific.